[No. 28056. Department Two. October 3, 1940.]

JACQUALINE SCHOCK et al., *Respondents*, v. RINGLING BROS. AND BARNUM & BAILEY COMBINED SHOWS, *Appellant*.[1]

[1]Reported in 105 P. (2d) 838.

*J. P. Tonkoff* (*John F. Reddy, Jr.,* of counsel), for appellant.

*Snively & Bounds* and *Owen Clarke,* for respondents.

STEINERT, J.—Amos D. Schock brought this action on his own behalf, and as guardian *ad litem* of his three minor daughters, Jacqualine, Evangeline, and Marian, to recover damages resulting from injuries sustained by the three children while watching the unloading of defendant's circus within a railroad yard in Yakima. A trial to the court, sitting without a jury, resulted in findings of fact in favor of plaintiffs in varying amounts. From a judgment entered in accordance with the findings, defendant appealed.

On August 23, 1939, at about 2:30 a. m., appellant's circus arrived in Yakima, Washington, by way of the Union Pacific Railroad. A large crowd of spectators, composed of men, women, and children, numbering from two hundred to three hundred people, congregated at the railroad yard during the early morning hours to watch the circus unload its equipment. At about 7:30 o'clock in the morning, respondents Jacqualine, Evangeline, and Marian Schock arrived at the railroad yard, accompanied by two women and three other children. Jacqualine was twelve years of age; Evangeline was eleven; and Marian was ten.

The railroad yard at which the circus unloaded its equipment was located in a section of the city of Yakima where the normal traffic conditions were not heavy. The east side of the yard was bounded by a high fence, or fences, beyond which was situated private property used for industrial purposes. On the west, the nearest highway was two blocks distant. Within the yard, there was a series of about six railway tracks, which ran in a generally north and south direction. The main track was the one farthest east, and was about seven feet distant from the fence referred to above. The track with which we are here particularly concerned was the second track from the east. The railroad company had given the circus com-

pany the right to use any of the tracks and any part of the railroad right of way for unloading its equipment and paraphernalia.

The circus wagons, weighing from six to nine tons each, and equipped with tongues eight or ten feet in length, were transported to Yakima on flatcars, the decks of which were forty-five inches above the rails. The wagons were unloaded in the following manner: A platform approximately fifty feet in width, from east to west, and about sixty feet long, from north to south, had been constructed by means of planks laid between, and flush with the tops of, the rails. Steel chutes, or runways, about thirty feet long, and wide enough to accommodate a wagon, led from the top of the particular flatcar which was being unloaded, to the platform on the ground. The car from which the unloading was done was stationed at the north edge of the platform. A tractor, or an elephant, was used to push the circus wagons, one at a time, to the south end of the flatcar, where a 1¼″ rope was attached to the wagon, and the rope was then wound around two steel capstans, or snubbing posts. The wagon, on being given a slight push to start it down the steel runway, would descend by its own momentum, its speed being controlled by a circus employee who was in charge of the snubbing rope. When the hind wheels of the wagon reached the platform, the vehicle would be brought to a complete stop by use of the rope. From that point, the wagon would be swung to the right and pushed in a westerly direction, over the platform, across the intervening tracks, and out of the railroad yard. It would then be drawn to its place of destination at the circus grounds.

The respondent girls and their companions entered the railroad yard from the west, and stood for a while near a telephone pole situated at or near the westerly end of the platform, and between the fourth and fifth

tracks west of the boundary fence on the east. There they remained until some of the elephants came so close to them that they decided to move over toward the fence. They then proceeded eastwardly across the four intervening tracks and took a position near the south end of the fence and at a distance of fifty or sixty feet south and east of the platform. There was considerable evidence to the effect, and the trial court found in its oral decision, that the spectators were repeatedly warned to keep away from the platform where the unloading was in progress.

The accident out of which this action arose occurred at about eight o'clock in the morning, that is, about thirty minutes after the respondent girls had arrived at the scene of events. While the girls and their companions, with other spectators, were standing at the place last indicated, one of the circus wagons was being unloaded on the second track from the east, in the manner already described. As the wagon reached a point midway down the steel runway, the snubbing rope suddenly broke, allowing the vehicle to proceed forward out of control. A circus employee who had been guiding the wagon tongue shouted to the spectators "to run," and himself abandoned the vehicle. The wagon proceeded down the chute, and across the platform, at a speed described by most of the witnesses as the equivalent of a "fast walk," and variously estimated at from two to five miles per hour. The front wheels, or at least one of them, went off the platform at its southerly edge, and almost immediately thereafter the wagon came to an abrupt stop. At the same time, the wagon tongue swung sharply to the left, describing an arc which covered a portion of the area lying between the rails of the main, or first track, to the east, and beyond which the respondent girls had been standing.

When the rope snapped, and the warning was

sounded, the spectators in that vicinity scattered in various directions. The Schock girls ran toward the northwest, in a direction and to a distance that brought them within the reach of the wagon tongue. As a consequence, all three of the girls were struck by the tongue, and sustained the injuries for which recovery is here sought.

The rope which was in service on the particular occasion had been used for only one day. The length of time for which such ropes were normally used for such purposes was two days. The particular rope had been tested periodically during the operations on the day in question by tightening "up on it to see how much it would stand, after the wagon gets down on the ground off the car," and the employee who had charge of, and who used, the rope discovered no defect therein and saw nothing which indicated that it would not withstand the usual strain. The rope, however, was not introduced in evidence.

The question before us is whether or not, upon the facts shown by the evidence, appellant is chargeable with negligence for which it is liable to respondents. The determination of that question depends upon the extent of appellant's duty to respondent children; and the latter question, in turn, depends primarily upon the legal relationship existing between the children and appellant at the time of the occurrence, that is to say, whether the Schock children were invitees, licensees, or trespassers, as those terms are used in relation to persons going upon premises owned or occupied by another.

An invitee is one who is either expressly or impliedly invited onto the premises of another for some purpose connected with the business in which the owner or occupant of the premises is then engaged, or which he permits to be conducted thereon; and to es-

tablish such relationship, there must be some real or supposed mutuality of interest in the subject to which the visitor's business or purpose relates. *Gasch v. Rounds,* 93 Wash. 317, 160 Pac. 962; *Kinsman v. Barton & Co.,* 141 Wash. 311, 251 Pac. 563; *Garner v. Pacific Coast Coal Co.,* 3 Wn. (2d) 143, 100 P. (2d) 32; 3 Shearman & Redfield, Law of Negligence (6th ed.), § 706.

A licensee occupies an intermediate position between that of an invitee and that of a trespasser. He is one who goes upon the premises of another, either without any invitation, express or implied, or else for some purpose not connected with the business conducted on the land, but goes, nevertheless, with the permission or at the toleration of the owner. *Kinsman v. Barton & Co.,* 141 Wash. 311, 251 Pac. 563; *Holm v. Investment & Securities Co.,* 195 Wash. 52, 79 P. (2d) 708; 36 A. L. R. 37 (note).

A trespasser is one who enters the premises of another without invitation or permission, express or implied, but goes, rather, for his own purposes or convenience, and not in the performance of a duty to the owner or one in possession of the premises. *Heller v. New York, N. H. & H. R. Co.,* 265 Fed. 192, 17 A. L. R. 823; 36 A. L. R. 37 (note).

Under these definitions, respondent minors were, at best, mere licensees. They were not expressly invited to come upon the railroad yard, and the evidence does not, in our opinion, warrant a finding that they were impliedly invited. Furthermore, there was no mutuality of interest, as between those respondents and appellant, concerning the subject to which their visit related. The purpose for which they went upon the premises was not in connection with, or related to, the business in which appellant was then and there engaged, but was solely for their own pleasure, amuse-

ment, and satisfaction of curiosity. The most that can be said for respondent minors is that they were permitted to enter, and were allowed to remain upon, the premises as spectators.

It has long since become a settled rule of law in this state that, as to a bare or mere licensee, the owner or occupant of land owes only the duty of not wilfully or wantonly injuring him. Many of the cases, though not all, announcing that rule will be found in the recent case of *Garner v. Pacific Coast Coal Co.*, 3 Wn. (2d) 143, 100 P. (2d) 32. There is no contention in the case at bar, and there hardly could be, that the injuries sustained by these respondents were inflicted through wilfull or wanton negligence on the part of appellant.

The trial court was of the view, however, and respondents now contend, that this case presents an exception to the rule above stated, by virtue of the so-called "attractive nuisance" doctrine. That doctrine, which has been variously termed the "attractive nuisance," "attractive agencies," "attractive instrumentalities," "torpedo," or "turntable" doctrine, may be generally stated thus: One who maintains or creates upon his premises, or upon the premises of another, or in any public place, an instrumentality or condition which may reasonably be expected to attract children of tender years, and to constitute a danger to them, is under a duty to take the precautions that a reasonably prudent person would take, under similar circumstances, to prevent injury to such children.

The pioneer case involving what is now most often referred to as the "attractive nuisance" doctrine is *Lynch v. Nurdin* (1843), 1 Q. B. 29, 113 Eng. Reprint 1041, in which case a child seven years of age was allowed to recover for injuries sustained as the result of being run over by a horse-drawn cart which had been left standing unattended in a street.

The leading case in this country upon the subject is *Railroad Co. v. Stout* (1873), 17 Wall. (U. S.) 657, 21 L. Ed. 745, in which a boy six years of age was allowed to recover for injuries received while playing upon a turntable left unguarded and unattended upon defendant's premises. From the latter case, and others similar to it, the doctrine acquired its designation as the "turntable" doctrine. Since that time, many cases involving not only turntables, but also various other agencies and instrumentalities, have engaged the attention of the American courts.

There is much diversity of judicial opinion regarding the doctrine, not only as to whether it should be accepted or rejected, but also, where accepted, as to the extent of its applicability. An excellent monograph upon the subject, dealing with the cases in general, will be found in 36 A. L. R. 37 to 294, supplemented by annotations in 39 A. L. R. 486, 45 A. L. R. 982, 53 A. L. R. 1344, and 60 A. L. R. 1444.

It would be impossible, as well as fruitless, to analyze the many cases upon the subject. It is, however, desirable to refer to our own cases, and to ascertain therefrom the attitude which this court has taken with reference to the doctrine.

The first case upon the subject in this state was *Ilwaco R. & Nav. Co. v. Hedrick,* 1 Wash. 446, 25 Pac. 335, 22 Am. St. 169, decided in 1890. It is interesting to note that the instrumentality involved in that was a turntable. A child between five and six years of age was injured by the revolution of a turntable to which he had been attracted by the sight of a number of children at play thereon. The device had been left insecurely fastened, and with knowledge on the part of the owner that young children were attracted to it and were in the habit of playing on and around it. To have locked or securely fastened the table, the court found,

would have entailed little inconvenience to the owner. In upholding a judgment for the plaintiff, this court said that

"It was the duty of appellant to so secure it as to prevent injury to those who, by reason of their tender years, were incapable of comprehending its dangerous character, either by locking it, or in some other way preventing access to it."

In *Clark v. Northern Pac. R. Co.*, 29 Wash. 139, 69 Pac. 636, 59 L. R. A. 508, a boy twelve years of age, who was on his way to a circus, passed through a railroad switch yard. He was twice warned to get off the premises, but was nevertheless permitted to proceed. While in the switch yard, he jumped upon a moving flatcar, and upon arriving near his place of destination jumped from the car and attempted to run across the track, when he was struck and killed by a freight train. Recovery was denied on the grounds that the boy was of sufficient age and experience to be chargeable with knowledge of the attendant danger; that he had not been invited to come upon the premises; and that he had been twice warned to leave. The court took the view that the repeated warnings by the defendant's agents evidenced a careful effort to prevent the opportunity for danger, and that more could not have well been done, except by resort to forcible expulsion. The court recognized the "turntable" doctrine, but observed that it had not been uniformly adopted by the American courts, and that it had been severely criticized by some. Reference, in the opinion, to the *Ilwaco* case, *supra*, was followed by this statement:

". . . but, in view of the more modern tendency of the courts, we should, however, hesitate to extend the rule as one of general application to other conditions."

In *Nelson v. McLellan,* 31 Wash. 208, 71 Pac. 747, 60 A. L. R. 793, 96 Am. St. 902, *Akin v. Bradley Engineering & Machinery Co.,* 48 Wash. 97, 92 Pac. 903, 14 A. L. R. (N. S.) 586, and *Olson v. Gill Home Inv. Co.,* 58 Wash. 151, 108 Pac. 140, 27 L. R. A. (N. S.) 884, it was held that for a person to leave explosives unguarded and improperly exposed on premises where children were knowingly accustomed to gather and play was negligence, and would render the guilty party liable for injuries to such youths resulting from their tampering with the explosives.

In *Curtis v. Tenino Stone Quarries,* 37 Wash. 355, 79 Pac. 955, a boy six years of age was injured by stepping through a hole in a platform located on factory premises and catching his foot in the cog wheels below. The boy was a trespasser at the time. Recovery was sought on the theory of the turntable cases. In denying relief, this court said:

"We are not unmindful of the humane rule of law that forbids a property owner to leave unguarded dangerous machinery and dangerous places, which may be of such a character as to attract young children, or to allure them into danger; but the rule is not of general application, and cannot be extended to cases such as this. There was nothing alluring or attractive about these premises or machinery, nothing to invite children thither, and nothing dangerous about the place and machinery when not in use. . . .

"To hold, as a general and universal rule of law, that the owners of mills and factories must so construct and maintain their premises as to be reasonably safe for trespassers, infants or adults, regardless of how they may gain admission, would be destructive of all industry and all property rights. We are satisfied, therefore, that the respondent violated no duty it owed to the appellant as a trespasser upon its premises."

In *Harris v. Cowles,* 38 Wash. 331, 80 Pac. 537, 107 Am. St. 847, a girl of tender years was injured when

her wrist was caught between the jamb and one of the wings of a revolving door maintained by a family hotel, in the hallways of which children were accustomed to play. The court held that the doctrine of the turntable cases did not apply because it would have been manifestly impracticable to keep the door locked or guarded while it was serving the purposes for which it was intended. Continuing its discussion, the court then made the extreme statement that "this court will not extend the application of the doctrine of the turntable cases beyond a turntable itself."

However, in the very next case involving this doctrine, as applied to machinery, *McAllister v. Seattle Brewing & Malting Co.*, 44 Wash. 179, 87 Pac. 68, this court allowed recovery to a nine-year-old trespasser for injuries sustained upon a sheave wheel operated by the defendant upon an unopened, but used, street adjoining its premises. The court stated that the rule of wanton or wilful negligence had not been adopted in its entirety in this state; that, on the contrary,

"Where dangerous machinery and dangerous substances of a character likely to excite the curiosity of children and allure them into danger, have been left unguarded in exposed places close to the highways, or play grounds of children, even though on the premises of the owner, and children have been attracted to them and met with injury, the owner or person leaving the dangerous machinery or substance is liable for such injury."

The opinion further stated that the cases rest on the principle

". . . that it is negligence in itself to leave, exposed and unguarded near the haunts of children, dangerous machinery or compounds which must necessarily result in injury to them if they come in contact with it. . . . It is enough that the thing is dangerous in itself, and is attractive and alluring to children, and has been left exposed and unguarded in a place

where it must reasonably have been anticipated that children would be attracted to it, and tempted to play with and handle it."

In *Gordon v. Snoqualmie Lumber & Shingle Co.,* 59 Wash. 272, 109 Pac. 1044, 29 L. R. A. (N. S.) 88, a nine-year-old girl was scalded when a plug came out of a hot-water barrel from which she was attempting to take a pail of water. The barrel was located on defendant's premises, and children had been accustomed to play about it. This court held that the case was not covered by the attractive nuisance doctrine; that, even if it should be conceded that children were lured to the barrel, and that the hot water was dangerous, it could not be said, from the evidence, that the water was unguarded or exposed in such a way as to render the owner liable. The case was held to fall within the rule of *Clark v. Northern Pac. R. Co., Curtis v. Tenino Stone Quarries,* and *Harris v. Cowles, supra.*

In *Haynes v. Seattle,* 69 Wash. 419, 125 Pac. 147, a force of men working for the city of Seattle was engaged in stretching electric light wires on poles in a street adjacent to a school building. A group of boys who were attracted by the operation began playing with the moving wire, and one of them was injured. The workmen were some distance away at the time, and did not observe the youths. In permitting recovery, this court said:

"A child of tender years who meets with an injury upon the streets or upon the premises of a private owner, though a technical trespasser, may recover for such injury if the thing causing it has been left exposed and unguarded near the playgrounds or haunts of children and is of such a character as to be alluring or attractive to them, or such as to appeal to childish curiosity and instincts; . . . [Citing a number of cases already referred to above.]"

The case upon which respondent places strongest reliance is *Bjork v. Tacoma,* 76 Wash. 225, 135 Pac. 1005, 48 L. R. A. (N. S.) 331. In that case, a child about three years old was playing, with a companion of about the same age, along a flume which the city of Tacoma had constructed in an enclosed right of way near a street in a populous part of the city. The cover of the flume had been allowed to remain out of repair for a period of about three weeks. The child fell through a hole in the flume and was drowned. After reviewing a number of cases, including some already cited herein, and certain text authorities, touching the turntable, machinery, and dynamite cases, this court said:

"The turntable and machinery cases, however, are in no just sense *sui generis.* They rest, as it seems to us, upon the one broad principle common to all cases of injury from dangerous premises and all cases of so-called 'attractive nuisances,' that there is always a duty due to society upon the owner of premises to take reasonable care to so use his own as not to injure another, a failure to observe which is negligence."

Recovery was allowed in that case upon the ground that it was for the jury to determine whether or not the opening in the flume was "in its nature a thing reasonably to be anticipated as inticing to young children."

In *Jorgenson v. Crane,* 86 Wash. 273, 150 Pac. 419, L. R. A. 1915F, 983, a six-year-old boy was injured while playing upon a wheeled scraper which a contractor had left, in an unfastened and unguarded condition, upon the school playground. In reversing a judgment of dismissal, this court held that the wheeled scraper was an appliance with which it was dangerous for children of such tender years to play as they did, and that when the contractor left it upon the school ground he knew, or as a reasonable person ought to have known, that they would so play with it.

In *Barnhart v. Chicago, M. & St. P. R. Co.*, 89 Wash. 304, 154 Pac. 441, L. R. A. 1916D, 443, it appears that surface or flood waters had formed a pond upon a railroad right of way near the city limits of Snohomish. Boys in the neighborhood were accustomed to resort to the pond for play, using a raft which had been constructed of old railroad ties. On a certain occasion, two boys, six and eight years of age, respectively, were playing upon the raft, when the older one fell into the water and was drowned. This court, in reversing a judgment for the plaintiff, held that the turntable doctrine did not apply. We quote the essence of the opinion:

"The turntable doctrine has been adopted by the courts of last resort in a considerable number of states, and rejected by almost an equal number. There is a tendency generally on the part of courts which have approved the doctrine to limit, rather than extend, its application. [Citing cases.] . . .

"The turntable doctrine makes the owner liable because the dangerous agency was attractive to children of tender years, and in playing about or with such agency, accident or injury would probably result.

"That a pond of water is attractive to boys for the purposes of play, swimming, and fishing, no one will deny. But its being an attractive agency is not sufficient to subject the owner to liability. It must be an agency such as is likely to, or will probably result in, injury to those attracted to it. That many boys every year lose their lives by drowning is a matter of common knowledge. But the number of deaths in comparison to the total number of boys that visit ponds, lakes, or streams for purposes of play, swimming, and fishing, is comparatively small. It would be extending the doctrine too far to hold that a pond of water is an attractive nuisance, and therefore comes within the turntable cases."

The opinion then distinguished the *Bjork* case, *supra,* with this statement:

"The flume [in the *Bjork* case], other than this particular opening, was covered. This was a dangerous agency which was attractive to children, and in the event a child should fall into the flume, death by drowning was inevitable. It was not of the same nature as a pond where children are accustomed to play, and where comparatively few lose their lives by drowning."

In *Heva v. School Dist. No. 1*, 110 Wash. 668, 188 Pac. 776, 9 A. L. R. 267, a boy twelve years of age, together with a companion, went to a school ground one Sunday and climbed a fire ladder leading to the roof of the school building. On being discovered, the boys attempted to escape, and in doing so one of them stumbled and fell to the fire-escape landing below. This court held that common objects, such as ladders, fences, and trees, the uses and dangers of which are obvious, at least to a normal child of twelve years, and which cannot be made inaccessible without destroying the purposes for which they are intended, could not be held to be attractive nuisances. In that opinion, the cases to which we have already adverted were, in the following language, assembled and classified.

"Courts differ as to what constitutes a nuisance attractive to children, but this court has been somewhat liberal in applying the doctrine, and now has no intention or desire to depart from the rule heretofore followed. *Ilwaco R. & Nav. Co. v. Hedrick*, 1 Wash. 446, 25 Pac. 335, 22 Am. St. 169; *McAllister v. Seattle Brewing & Malting Co.*, 44 Wash. 179, 87 Pac. 68; *Haynes v. Seattle*, 69 Wash. 419, 125 Pac. 147; *Bjork v. Tacoma*, 76 Wash. 225, 135 Pac. 1005, 48 L. R. A. (N. S.) 331; *Jorgenson v. Crane*, 86 Wash. 273, 150 Pac. 419, L. R. A. 1915F 983. But while the court permitted recovery in the cases cited, and also in cases involving the possession and control of dangerous explosives, *Nelson v. McLellan*, 31 Wash. 208, 71 Pac. 747, 96 Am. St. 902, 60 L. R. A. 793; *Akin v. Bradley Engineering & Machinery Co.*, 48 Wash. 97, 92 Pac. 903, 14 L. R. A. (N. S.) 586; *Olson v. Gill Home Investment Co.*, 58

Wash. 151, 108 Pac. 140, 27 L. R. A. (N. S.) 884; it has not hesitated to distinguish and limit the doctrine. *Clark v. Northern Pac. R. Co.*, 29 Wash. 139, 69 Pac. 636, 59 L. R. A. 508; *Curtis v. Tenino Stone Quarries*, 37 Wash. 355, 79 Pac. 955; *Harris v. Cowles*, 38 Wash. 331, 80 Pac. 537, 107 Am. St. 847; *Gordon v. Snoqualmie Lumber & Shingle Co.*, 59 Wash. 272, 109 Pac. 1044, 29 L. R. A. (N. S.) 88; *Barnhart v. Chicago, Milwaukee & St. P. R. Co.*, 89 Wash. 304, 154 Pac. 441, L. R. A. 1916D 443."

In *Hutchins v. School Dist. No. 81*, 114 Wash. 548, 195 Pac. 1020, an open pit upon a school ground had been left unguarded for a period of seven months. During that time, small children had been accustomed to play around and about the excavation. A boy nine years of age, while playing with others, attempted to hop across a plank which had been laid over the pit; he fell and was injured. It was held that the evidence presented a question for the jury as to whether or not the nature of the dangerous place was such as to entice children, and to suggest to the school officers the reasonable probability of just such, or a similar, accident.

In *Smith v. McGoldrick Lumber Co.*, 124 Wash. 363, 214 Pac. 819, an eleven-year-old boy was drowned in a mill pond within the city of Spokane. The basis of the action was that the defendant had maintained a dangerous and alluring nuisance, on and about which children of immature years were attracted to play, and that no proper precaution had been taken by the defendant to prevent such activities. It appeared from the evidence that the property had been enclosed to the extent that it was practicable to do so, and that signs warning persons to "keep off these logs" had been posted. It was held that there was not sufficient basis for liability upon the ground of negligent maintenance of a dangerous nuisance attractive to children.

The cases which we have just reviewed cover a wide range of circumstances, and, while they do not by any means exhaust the list of possible situations to which the "attractive nuisance" doctrine may be attempted to be applied, they indicate with a fair degree of certainty the attitude of this court with reference to the doctrine.

That we have in this state accepted the doctrine, and have even, in certain instances, applied it liberally, there can be no doubt. That the doctrine is not to be strictly limited to turntable and machinery cases, is, likewise, now beyond question. But it is equally true that we have not hesitated to make distinctions as between different facts, instrumentalities, and conditions, and have limited the doctrine to such cases as reasonably call for its application.

■ To make the doctrine applicable to a given case, all of the following elements must be present: (1) the instrumentality or condition must be dangerous in itself, that is, it must be an agency which is likely to, or probably will, result in injury to those attracted by, and coming in contact with, it; (2) it must be attractive and alluring, or enticing, to young children; (3) the children must have been incapable, by reason of their youth, of comprehending the danger involved; (4) the instrumentality or condition must have been left unguarded and exposed at a place where children of tender years are accustomed to resort, or where it is reasonably to be expected that they will resort, for play or amusement, or for the gratification of youthful curiosity; and (5) it must have been reasonably practicable and feasible either to prevent access to the instrumentality or condition, or else to render it innocuous, without obstructing any reasonable purpose or use for which it was intended.

■ Having in mind these elements, we apply the test to the situation presented by the instant case. The

wagon itself was not, of course, a dangerous instrumentality. The element of danger lay in the operation of unloading; and we will concede, for the purpose of argument, that the danger in that respect was sufficient to bring the case within the first requirement of the doctrine. We will likewise assume the existence of the second and third of the above-listed requirements.

We are clearly of the opinion, however, that the fourth and fifth elements are lacking.

In no true sense can it be said, under the circumstances, that the instrumentality or the operation was left unguarded and exposed. On the contrary, the owner was immediately present, through its agents, was using the instrumentality, and was doing the very thing that it was required to do in order to conduct its business successfully. Furthermore, it would have been well nigh impossible for appellant to do more than it did to protect the spectators. It had warned them repeatedly to stay away from the platform, and the warning was sufficient to apprise the onlookers of the danger involved.

Manifestly, the railroad yard could not have been enclosed against access by the public, because a vast amount of heavy equipment had to be transported from the place within a limited time. The evidence is without dispute that the railroad tracks, which were in use, could not have been roped off, and even if it had been possible to do so, appellant could not have been expected to have its employees patrol the ropes. About the only things that appellant could have done, aside from giving the repeated warnings, would have been either to resort to forcible explusion or the securing of arrest of those who refused to obey the warning, or else to cease operations entirely. It can hardly

be claimed that they were required to go to any such extremes.

We are convinced that the doctrine of attractive nuisance should not be extended to cover a case of this kind.

■ If we look at the matter wholly aside from the relevancy of the attractive nuisance doctrine, and consider the case simply from the standpoint of appellant's duty under the circumstances to the spectators in general, whether adults or minors, we come to the same conclusion. If we proceed upon the theory that appellant was bound by the rule of reasonable care rather than by the "wilfull and wanton negligence" rule, we are convinced that appellant fully complied with its duty when it repeatedly warned the multitude to stay away from the platform. Appellant was not an insurer, and in the exercise of reasonable care it was not required to suspend its operations until, by inspection and test, it had found every piece of machinery and equipment to be free from all possible defects.

■ Directing attention specifically to the fact that the proximate result of the accident was the parting of the rope, respondents contend that the doctrine of *res ipsa loquitur* is here applicable. But even if it be assumed, *arguendo,* that respondents are correct in that contention, the resulting inference of negligence was rebutted by the evidence, which, in our opinion, established that there was no reason to anticipate that the rope would break.

It is true that respondents had been standing in a position of comparative safety, and that, when they ran into the zone of danger, they were acting under an emergency; but their act, however unfortunate it may have been, cannot be charged against appellant, in

view of the fact that it used reasonable care under the existing circumstances.

The judgment is reversed, with direction to dismiss the action.

BLAKE, C. J., JEFFERS, and DRIVER, JJ., concur.

BEALS, J., dissents.

