[No. 30006. Department One. January 6, 1947.]

R. L. DEFFLAND, *Appellant,* v. SPOKANE PORTLAND CEMENT COMPANY, *Respondent.*[1]

[1] Reported in 176 P. (2d) 311.

*Frank R. Freeman* and *Harvey Erickson,* for appellant.

*Witherspoon, Witherspoon & Kelley,* for respondent.

JEFFERS, J.—This action was instituted by R. L. Deffland, the father of Gerald Deffland, a minor aged thirteen years, in the superior court for Spokane county, against Spokane Portland Cement Company, a corporation, and Washington Water Power Company, a corporation, under and by virtue of the provisions of Rem. Rev. Stat., § 184, to recover for the alleged wrongful death of the minor, claimed to have been caused by Gerald Deffland coming in contact with high voltage electric wires located on the premises of defendant Portland Cement Company.

The trial court dismissed defendant Washington Water Power Company at the close of plaintiff's case. No appeal was taken from the judgment entered relative to the dismissal of the last-named defendant.

Defendant Spokane Portland Cement Company, by its answer, denied all the material allegations of plaintiff's amended complaint, and alleged affirmatively contributory negligence on the part of Gerald Deffland.

The cause came on for hearing before the court and jury on March 5, 1946. At the close of plaintiff's case, defendant challenged the sufficiency of plaintiff's evidence to sustain a verdict in favor of plaintiff, and moved the court for a non-suit on three grounds: (1) that the evidence was not sufficient to establish negligence on the part of defendant; (2) that the facts show that Gerald Deffland was guilty of contributory negligence; and (3) that the attractive nuisance doctrine was not applicable.

On March 13, 1946, the trial court made and entered an order and judgment of dismissal, wherein the court sustained defendant's challenge to the sufficiency of plaintiff's evidence, granted defendant's motion, and entered judgment dismissing the action.

Plaintiff has appealed from the judgment entered and assigns error on the refusal of the trial court to permit John Hannus, a companion of the deceased, to testify as to his knowledge of the danger involved in being in close proximity to the electric wires; on the refusal of the court to permit the case to go to the jury as to Spokane Portland Cement Company for its determination on the merits; and on the granting of a nonsuit and the directing of a verdict for that defendant.

In view of the questions presented in this case, a somewhat extended statement of the facts will be necessary, and, in making this statement and the conclusion to be drawn therefrom, we are mindful of the rule that a challenge to the sufficiency of the evidence or a motion for non-suit admits the truth of the plaintiff's evidence and all inferences which can reasonably be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, or in the light most favorable to the plaintiff. *Kedziora v. Washington Water Power Co.*, 193 Wash. 51, 74 P. (2d) 898.

Respondent for some years has been and was on August

31, 1945, maintaining and operating a cement plant near Millwood, in Spokane county, Washington. The buildings occupied by respondent cover a wide area, and there are several entrances to the buildings. The plant premises are not fenced, for the reasons, as stated by Mr. Neill, the plant superintendent, that there would have to be four or five gates over railroad tracks; that trains come into the plant at all hours of the day and night; that it would take over two miles of fence to enclose all the buildings. Some parts of the buildings are three stories high.

At different points on the premises, there are signs posted reading "No Admittance Without Pass from Office." (plaintiff's exhibit No. 10.) There was some evidence that some of these signs had become dim from dust, but John Hannus, who was with Gerald Deffland on the day of the accident, testified that both he and the deceased saw the signs.

Respondent obtains its electricity from Washington Water Power Company, which delivers the current to a pole described as being in front of the office building, and from there it is taken into the plant by respondent on its own poles, wires, and other equipment.

We are here particularly concerned with that part of respondent's building described as the "cupola" or "disconnect room," and especially with an opening leading into this disconnect room, together with the conditions surrounding such opening and the means by which the opening can be reached.

The cupola or disconnect room, together with the openings into such room from the outside, are shown on several of plaintiff's exhibits, namely, exhibits Nos. 1, 2, 3, and 9. Exhibits Nos. 1 and 9 show the opening in the part of the building to the right of the cupola through which the deceased and John Hannus went on the day of the accident, thus gaining admission to the roof of the building below such opening, over which roof they went to get up to the opening in the cupola. It is thirty-five feet from the edge of this roof to the ground, and about twenty feet from where the boys came out onto the roof up to the opening in the cupola. This roof has a one-quarter pitch, which ac-

cording to the testimony of Mr. Neill, superintendent of respondent company, means that it has a rise of six inches to the foot.

The openings into the cupola, of which there are three, are thirty-nine inches wide and sixty-eight inches high. In the center of the opening is an insulator thirty inches high, leaving from fourteen to twenty inches on each side between the insulator and the side of the opening. The wires come down to an insulator above each one of these openings, and another wire goes from the wires last mentioned to the insulator in each opening, and thence into the disconnect room. From the left side of the cupola, a guard-rail extends down to the edge of the roof below the openings. There is also a guard on the roof above each opening.

The Washington Water Power Company delivers sixty thousand volts of electricity to respondent.

The wires running from the poles to the disconnect room are not insulated. However, Mr. Steenbergen, called by appellant as an expert, testified that while it was possible, by means of an oil filled cable, to insulate a wire carrying sixty thousand volts, it would not be possible to use this method where the wire is strung from poles, because of the weight.

The disconnect room is reached inside the plant by going up three flights of stairs. At the top of the stairs is a door which is always kept locked, and on this door is a sign which reads "Danger, High Voltage, Keep Out." When one enters this room by the way last above indicated, he still has to go up a ladder to get to the insulators hereinbefore referred to.

Apparently, these various openings in the buildings had permitted pigeons to go into the building, where they nested and raised their young, referred to as "squabs."

There were about twenty men employed in the plant during the time it was operating, and when not operating there was a watchman who made the rounds of the plant.

There is no question but that it appears from the evidence that respondent had been bothered by boys coming to the plant after pigeons, prior to August 31, 1945. It also

appears that on different occasions boys had been chased out of the plant, and some of them spanked when they became defiant.

Gerald Deffland was an average boy between thirteen and fourteen years of age at the time of this unfortunate accident. According to the testimony of his mother, he was a healthy, normal boy, and was in the seventh grade. He lived about a mile from the plant and was quite friendly with John Hannus.

John Hannus was a normal, intelligent boy. While he did not admit that the boys sneaked into the plant when they went after pigeons, he did admit that they *avoided* the watchman, and it is undisputed that they went to the plant when the men were not working.

Walter King was called by appellant. This witness testified he had been a watchman at the plant; that he had seen pigeons around during the time he worked there and had seen boys there.

"Q. What were the boys doing there? . . . A. Well, there was some of the boys fetched their bicycles down to the shop down there and would have them fixed, for one thing, principally, that I know of. . . . Q. What part of the plant did the boys go in, Mr. King? . . . A. They went through the kiln room down to the machine shop. Q. Did you see them in any other parts of the Plant? A. No, I didn't pay any attention to them after they went in the machine shop. . . . Q. You may state what the boys did there, Mr. King. MR. KELLEY: Where, the kiln room or machine shop, if your Honor pleases? MR. ERICKSON: (Q.) In the plant. THE COURT: Any place in the plant. MR. KELLEY: At what time? MR. CONNELLY: Three to four months before he quit has been established. THE COURT: Yes. A. Well, there was boys tried to get in there to hunt for pigeons. MR. ERICKSON: Q. And when? A. When I was on duty as watchman."

On cross-examination, Mr. King stated that when the boys tried to get in to get pigeons he chased them out.

John Hannus was twelve years old on October 29, 1945, and was in the seventh grade. He had known Gerald Deffland since Gerald's father moved into that community. Both he and Gerald had pigeons.

"Q. And where did you get those pigeons? A. Under the bridge, and some of them over at the cement plant. Q. And were they full-grown pigeons when you got them at the cement plant, or were they squabs? A. Just squabs. Q. You got them out of their nests? A. Yes, sir."

The first time he and Gerald went to the cement plant to get pigeons was about four weeks before August 31, 1945. On this occasion, the boys entered through a door which was open, went about halfway through the building, and got four squabs, which they carried away in their shirts. No men were working around the plant at that time.

At this point, the witness was shown plaintiff's exhibit No. 4, which shows a part of the inside of the plant. It also shows the stairway leading up to the third story of the building, and some of the girders. The witness was asked to point out where they went on this trip.

"Q. On those girders, those wooden beams that you are pointing to (indicating)? A. Back in the corners."

About five days later, these two boys again went to the plant and entered it through the same door as on the first visit, and got some squabs at about the same place as on the first visit, but a little higher up. They went up the stairs hereinbefore referred to.

"Q. Up those steel stairs? Well, did the pigeons nest right at the stairs, or did you have to leave there? A. Well, you have to go over on these planks, and, then, down over there (indicating) in the corners, and there is some stairs going up higher."

On this trip, the boys again took the squabs away in their shirts. The plant was not running at this time, and they did not see any men.

About a week later, John again went to the plant, but Gerald was not with him on this occasion. He was accompanied by George Smeltzer. They went into the plant the same way.

"Q. And did you and George get some squabs? A. No, we just barely got in and the man told us to go out and come back some Saturday or Sunday. Q. A man told you to get out and come back some Saturday or Sunday? A. Because it was running that day."

The next day, John and Gerald again went to the plant.

"Q. Were there any men around there, then, any watchmen or other men that you know of? A. We didn't see any. Q. I see. And what did you and Jerry [Gerald's nickname] do? What part of the plant did you go into, then? A. Went in the same way, and went up them stairs, and we got a few pigeons, and, then, went up to the roof."

At this point, John was asked to step down and look at the pictures (no indication of which one) and asked if he saw anything that was familiar.

"A. We went right to there (indicating). That tin was torn, I guess, it was cut, and, then, it was bent back, and we went just right out to there (indicating)."

We assume that John was pointing to the openings shown on plaintiff's exhibit No. 1, which lead out onto the roof hereinbefore referred to, that is, just below the cupola or disconnect room.

On this occasion, the boys did not go out onto the roof below the cupola, but stood in the opening above referred to and threw some pieces of hard dust up against the cupola to see if there were any pigeons on the inside. It will be remembered that, in order to get in the cupola or disconnect room from inside the building, it is necessary to go up the stairs which the boys used, and at the top is the door leading into the cupola, on which is a sign "Danger, High Voltage, Keep Out." It does not appear how the boys got from the stairs over to the opening where they stood on the occasion last above referred to.

John further testified that, on this trip, as it was getting dark, they went back. It appears without contradiction from the cross-examination of this witness that the boys never went out onto the roof below the cupola on any of these occasions, until the visit of August 31st, to which we shall now refer.

About three or four days after the last visit, the two boys again went to the plant. This was on August 31, 1945, around noon. They went in through the same door.

"Q. Did you see any men around there that time? A. Yes. Q. Do you know who the man is that you saw? A. No."

The witness stated he knew the man was a watchman, because he had a time clock. They saw this man when they first went in.

"A. It was when we first went in. We asked him if we could go up there, and he said, 'Yes' if we didn't touch the wires. . . . Q. And where did you go to, then? A. We went up this ladder. Q. And in what part of the building did you and Jerry finally go to? A. Up on the roof. Q. Is that the same roof you just told us about? A. Yes. Q. Will you point it out again, John, so there won't be any doubt in anyone's mind? A. Right there (indicating). [While no reference is made to any exhibit, we assume the witness meant the roof below the cupola.] Q. Now, what did you do when you got up to this place? Was that opening still there, on plaintiff's exhibit 1? A. Yes. [This was the opening in the side of the building where the tin had been pulled back or partly knocked off, which permitted the boys to go through and out onto the roof referred to. It was not a door or a window.] Q. Sit down, John. And what did you and Jerry do when you got up to this opening, and where did you go to? A. We climbed through and went up to the first window right there (indicating). [We assume this was the first window in the cupola, and to reach this window the boys had to go about twenty feet up over the one-quarter pitch roof.] Q. You and Jerry? A. Yes, at first, and I come out with some pigeons and handed them to him, and, then, I went in about two or three times, and, then, he come in. Q. And did you have some place to keep the squabs? A. Yes. We got a sack."

The witness stated they got about thirty pigeons.

"Q. And how many times did you yourself go through that window, John, again, either to go in or coming back out with squabs? I am pointing to plaintiff's exhibit 1, the first window on the cupola? A. I went in about three times. A. And did Jerry Deffland go in through the window, too? A. He went in and come out, too . . . Q. Now, did you see or hear anything happen to Jerry, then, after you and he had made those trips through that window that you have referred to? . . . A. Yes, I heard a big buzz, and, then I heard him, and then, I turned around and I seen a big blue blur, and I heard him fall. Q. And where were you? Were you inside this cupola on exhibit 1, or outside on the roof? A. I was right back up in there (indicating). [No place is identified, but we assume John was inside the

cupola.] Q. Pointing to exhibit 2, [this exhibit shows the windows in the cupola and part of the roof below them] to the first window (indicating). Now, John, where was Jerry when you first saw him? . . . A. You mean when he was out on the roof? Q. Yes. I mean after you had heard this blur and buzz. A. He was right in there (indicating). Q. Pointing to the sheet-iron roof on plaintiff's exhibit 2 (indicating). And what was he doing or saying? A. He said after I went out there and I covered the dirt up over his clothes, he said, 'Tell Mother I ain't hurt.' Q. Sit down, John. You say you put dirt on his clothes? A. Yes. Q. Why did you do that? A. Because they were smoking and on fire."

John put out the fire, during which time Gerald was talking but did not get up from where he was lying on the roof. John then left Gerald and went back through the opening in the side of the building, out of the plant, and over to a farmhouse to get help. When he first got back to the plant with help, they apparently went around on the outside of the building to where they could see Gerald. John stated that Gerald was rolling around, and apparently before they could get to him, he rolled off the roof onto the ground. He was unconscious when the men reached him, and he died that evening in the hospital. Dr. Nelson testified that death was caused by shock due to burns.

On cross-examination, John testified that, as they went through the opening which led out onto the roof, on the occasion last mentioned, they touched the tin side of the building and received a little shock. John's attention was then called to the window in the cupola through which the boys went to get inside, and was asked how much space there was between the insulator in the middle of the window and the side of the window, to which the witness answered about twenty inches. The witness further stated that the boys went through this opening sideways. John further stated that Gerald went in and came out and then went back in, and, on his way coming out, he said to John, who was then inside the cupola, "Watch out for the wires."

"Q. And what happened, then? A. Well, I said, 'Okay' and I turned around to see if the white pigeon was there and then I heard a big buzz and I couldn't see hardly any-

thing. . . . Q. Well, you boys, when I say 'you boys' I mean Jerry Deffland and you and George Smeltzer and Bryan or any other boy that would go down with you kids would sort of get in the kiln room or machine shop or some place where the men couldn't see you, wouldn't you? A. Yes. Q. And you would wait until the men went off shift at four-thirty, Johnny? A. We didn't know when they went off. Q. But I mean you would wait until they went off shift? A. Yes."

This witness further stated that the sacks he and Gerald had on the last trip were obtained in another shed, and that no one saw them get the sacks. He further testified that, when his mother found out he was going to the cement plant, she told him not to go there any more, that he might get hurt from electricity. John further testified that he and Gerald saw the signs right by the door of the plant, to which we have hereinbefore referred, and that they also saw the signs on the road before they got to the plant; that on one occasion a watchman chased them out of the plant and told them the electrical wires were very dangerous.

It does not appear just when the opening through which the boys passed to get out on the roof may have been made, but apparently it was used about once a year to enable workmen to change the insulators. However, when the workmen went out on the roof, they used safety belts and ropes in order that they would not slip on the steep roof.

■■ We are of the opinion that Gerald Deffland was not an invitee, but at most was a mere licensee. In *Garner v. Pacific Coast Coal Co.*, 3 Wn. (2d) 143, 100 P. (2d) 32, we had occasion to, and did, define the word invitee as follows:

"An invitee is one who is either expressly or impliedly invited onto the premises of another for some purpose *connected with the business* in which the owner or occupant is then engaged, or which he permits to be conducted thereon; there must be some real or supposed mutuality of interest in the subject to which the visitor's business or purpose relates. [Citing authority.]" (Italics ours.)

■ See, also, *Christensen v. Weyerhaeuser Timber Co.*, 16 Wn. (2d) 424, 133 P. (2d) 797. In the cited case, we defined a licensee to be one who goes upon the premises of

another, either without any invitation, express or implied, or else for some purpose not connected with the business conducted on the land, but goes, nevertheless, with permission or at the toleration of the owner. *Kinsman v. Barton & Co.,* 141 Wash. 311, 251 Pac. 563; *Holm v. Investment & Securities Co.,* 195 Wash. 52, 79 P. (2d) 708; *Schock v. Ringling Bros. etc. Shows,* 5 Wn. (2d) 599, 105 P. (2d) 838.

■ In *Garner v. Pacific Coast Coal Co., supra,* we also announced the rule relative to the duty owed by the owner or occupant of land to a mere licensee:

"A long line of decisions in this state has emphatically declared and definitely settled the rule that, as to a bare or mere licensee, the owner or occupant of land owes only the duty of not wilfully or wantonly injuring him. [Citing a long list of cases beginning with *McConkey v. Oregon R. & Nav. Co.,* 35 Wash. 55, 76 Pac. 526, and ending with *Holm v. Investment & Securities Co.,* 195 Wash. 52, 79 P. (2d) 708.]"

Appellant, undoubtedly realizing that he could not show that respondent had wilfully or wantonly injured Gerald Deffland, has relied upon the attractive nuisance doctrine as a basis for his right to recover, contending that it is an exception to the degree of care ordinarily owed to a licensee.

■ The trial court was of the opinion that the deceased was a mere licensee, but considered the attractive nuisance doctrine and its applicability to the facts herein. This doctrine was discussed at length in the recent case of *Schock v. Ringling Bros. etc. Shows,* 5 Wn. (2d) 599, 105 P. (2d) 838. In that case, the court, after stating the rule relative to the duty owed by the owner or occupant of land to a mere licensee hereinbefore set out, stated:

"The trial court was of the view, however, and respondents now contend [as does appellant in the instant case], that this case presents an exception to the rule above stated, by virtue of the so-called 'attractive nuisance' doctrine. That doctrine, which has been variously termed the 'attractive nuisance,' 'attractive agencies,' 'attractive instrumentalities,' 'torpedo,' or 'turntable' doctrine, may be generally stated thus: One who maintains or creates upon his premises, or upon the premises of another, or in any public place, an instrumentality or condition which may reasonably be expected to attract children of tender years, and

to constitute a danger to them, is under a duty to take the precautions that a reasonably prudent person would take, under similar circumstances, to prevent injury to such children."

The opinion in the cited case refers to and quotes from many decisions of this court, among them, *Ilwaco R. & Nav. Co. v. Hedrick,* 1 Wash. 446, 25 Pac. 335, 22 Am. St. 169, which was the first case in this state dealing with the question before us, and which involved a turntable. We stated in the *Schock* case, referring to the case last cited:

"The device had been left insecurely fastened, and with knowledge on the part of the owner that young children were attracted to it and were in the habit of playing on and around it. To have locked or securely fastened the table, the court found, would have entailed little inconvenience to the owner. In upholding a judgment for the plaintiff, this court said that

" 'It was the duty of appellant to so secure it as to prevent injury to those who, by reason of their tender years [in that case a child between five and six years of age], were *incapable of comprehending its dangerous character,* either by locking it, or in some other way preventing access to it.' " (Italics ours.)

In the *Schock* case, reference is also made to *Clark v. Northern Pac. R. Co.,* 29 Wash. 139, 69 Pac. 636, 59 L. R. A. 508, wherein a boy twelve years of age passed through a switchyard on his way to a circus. He was twice warned to get off the premises, but nevertheless was permitted to proceed. While in the switchyard, he jumped upon a moving flatcar and, upon arriving near his destination, jumped from the car and was struck and killed by a freight train. Recovery was denied on the grounds that the boy was of sufficient age and experience to be chargeable with knowledge of the attendant danger; that he had not been invited to come upon the premises; and that he had been twice warned to leave. The court recognized the "turntable" doctrine, but observed that it had not been uniformly adopted by the American courts, and that it had been severely criticized by some. Reference, in the *Clark* opinion, to the *Ilwaco* case, *supra,* was followed by this statement:

"But, in view of the more modern tendency of the courts, we should, however, hesitate to extend the rule as one of general application to other conditions."

The *Schock* case also refers to *Harris v. Cowles*, 38 Wash. 331, 80 Pac. 537, 107 Am. St. 847, and, in regard thereto, states:

"A girl of tender years was injured when her wrist was caught between the jamb and one of the wings of a revolving door maintained by a family hotel, in the hallways of which children were accustomed to play. The court held that the doctrine of the turntable cases did not apply because it would have been manifestly impracticable to keep the door locked or guarded while it was serving the purposes for which it was intended. Continuing its discussion, the court then made the extreme statement that 'this court will not extend the application of the doctrine of the turntable cases beyond a turntable itself.'

"However, in the very next case involving this doctrine, as applied to machinery, *McAllister v. Seattle Brewing & Malting Co.*, 44 Wash. 179, 87 Pac. 68, this court allowed recovery to a nine-year-old trespasser for injuries sustained upon a sheave wheel operated by the defendant upon an unopened, but used, street adjoining its premises. The court stated that the rule of wanton or wilful negligence had not been adopted in its entirety in this state; that, on the contrary,

" 'Where dangerous machinery and dangerous substances of a character likely to excite the curiosity of children and allure them into danger, have been left unguarded *in exposed places close to the highways*, or *play grounds of children*, even though on the premises of the owner, and children have been attracted to them and met with injury, the owner or person leaving the dangerous machinery or substance is liable for such injury.' " (Italics ours.)

In the case of *McAllister v. Seattle Brewing & Malting Co.*, 44 Wash. 179, 87 Pac. 68, the court distinguished the case of *Curtis v. Tenino Stone Quarries*, 37 Wash. 355, 79 Pac. 955, in the following words:

"There the machinery on which the child was injured was within an enclosure [a building] which was constructed at a considerable distance from any highway [200 yards] or any place where children were accustomed to play, and had no especial attractiveness, being machinery in common use

and no more exposed than the manner of its use required; and we held, which must unquestionably be the rule, that the owner of such property owed no such duty to trespassing children as required him to so fence and guard his machinery as to render it impossible for them to receive an injury therefrom."

Judge Rudkin wrote the opinion in the *Tenino Stone Quarries* case, *supra,* and, at this point, we desire to quote from that opinion:

"To hold, as a general and universal rule of law, that the owners of mills and factories must so construct and maintain their premises as to be reasonably safe for trespassers, infants or adults, regardless of how they may gain admission, would be destructive of all industry and all property rights."

■ After citing and quoting from the cases last above referred to and many others, the opinion in the *Schock* case continues:

"That we have in this state accepted the doctrine, and have even, in certain instances, applied it liberally, there can be no doubt. That the doctrine is not to be strictly limited to turntable and machinery cases, is, likewise, now beyond question. But it is equally true that we have not hesitated to make distinctions as between different facts, instrumentalities, and conditions, and have limited the doctrine to such cases as reasonably call for its application.

"To make the doctrine applicable to a given case, all of the following elements must be present: (1) the instrumentality or condition must be dangerous in itself, that is, it must be an agency which is likely to, or probably will, result in injury to those attracted by, and coming in contact with, it; (2) it must be attractive and alluring, or enticing, to young children; (3) the children must have been incapable, by reason of their youth, of comprehending the danger involved; (4) the instrumentality or condition must have been left unguarded and exposed at a place where children of tender years are accustomed to resort, or where it is reasonably to be expected that they will resort, for play or amusement, or for the gratification of youthful curiosity; and (5) it must have been reasonably practicable and feasible either to prevent access to the instrumentality or condition, or else to render it innocuous, without obstructing any reasonable purpose or use for which it was intended."

Respondent argues, in regard to the first element above mentioned, that it was the pigeons which lured Gerald Deffland, and not the insulators, wires, openings into the disconnect room, or the slippery thirty-foot tin roof on which he climbed. Much might be said in favor of respondent's contention, were it not for the fact that element No. 1 seems to cover a "condition" as well as an "instrumentality"; and so we shall assume, for the purpose of this case, that the trial court correctly considered the condition created by the high voltage wire and the pigeons in determining whether or not the attractive nuisance doctrine was applicable to the facts in this case.

 It is first contended by appellant that respondent was guilty of negligence in failing to comply with Rem. Rev. Stat., § 5435 [P.P.C. § 692-1], rule 14:

"All wires or appliances carrying a current of less than seventy-five hundred (7,500) volts, inside of any building or vault, for the distribution of electrical energy, shall be sufficiently insulated, or so guarded, located, or arranged as to protect any person from injury. All wires or appliances carrying a current of over seventy-five hundred (7,500) volts, shall be insulated, or so located or arranged as to protect any person from injury; or shall be protected by a grounded metallic guard screen or other device equally as efficient, so arranged that no person may come within three times the arcing distance of the given voltage of such conductor or appliances as rated by the American Institute of Electrical Engineers for discharges between needle points; or by a guard-rail or other device so arranged that no person may come within three feet of the same."

It will be remembered that appellant's own witness stated that wires strung from poles, carrying the voltage they did, could not be insulated. It will also be remembered that there is a guardrail on the roof below the openings into the disconnect room running clear down to the edge of the roof, and guards above each of the windows. In view of the location of these wires and the guardrails, we are of the opinion it cannot be said respondent was guilty of any negligence based upon a violation of the above statute.

It was certainly not practicable to fence the entire area occupied by these buildings, in view of the conditions exist-

ing relative to trains; and further it does not appear in the record that there were any wires within the plant constituting a dangerous agency which could be contacted by one coming into the buildings, it being possible to come in contact with them only when one climbed up to the third story and then in some manner reached the opening hereinbefore referred to, and through that opening went out onto the one-quarter pitch roof, and over that roof up to the window in the disconnect room.

We stated in the *Schock* case, *supra*:

"Manifestly, the railroad yard could not have been enclosed against access by the public, because a vast amount of heavy equipment had to be transported from the place within a limited time."

The second element, as above stated, is "it must be attractive and alluring, or enticing, to young children."

Respondent's superintendent undoubtedly knew that pigeons made their nests in and about the plant, and of course knew that high voltage wires came into the disconnect room, and so we shall assume that the pigeons and wires created a condition which may be considered in determining whether or not the "attractive nuisance" doctrine is applicable herein.

The third element is that the children must have been incapable, by reason of their youth, of comprehending the danger involved.

The trial court, as appears from its memorandum decision, seems to have been of the opinion that the third element was not present; in other words, that both Gerald Deffland and John Hannus did comprehend the danger. While it is undoubtedly true that neither Gerald nor John knew that there was sixty thousand volts of electricity in those wires, they knew the wires were dangerous. They had been warned away, and had been chased out of the plant. They had read the signs. They had been told not to touch the wires. Yet in spite of all these warnings, they went out onto the roof, they crawled in sideways through an opening between the insulators carrying the wires, at most not more than twenty inches wide. In addition to this, as

Gerald came out the second time, he told John to look out for the wires. We agree with the trial court that Gerald did comprehend the danger, but, in his eagerness to get the squabs, he took a chance.

However, it is contended by appellant that the boys could not be expected to know that the electricity in that wire would arc, or jump, five inches, and that any one coming within five inches of the wire would receive a full charge of electricity. There is no evidence showing whether Gerald actually touched the wire, or whether he received the shock from an arcing, or jumping, of the electricity.

The only testimony relative to the arcing distance of a wire carrying electricity was given by Mr. Steenbergen, hereinbefore referred to. This witness had testified that the maximum voltage with which he had any experience was 13,200. He was then asked what was the minimum arcing distance of sixty thousand volts of electricity. An objection to the question was made and overruled.

"A. Approximately, that is, taken through two pinpoints, that is rather hard to decide upon, except for the atmosphere and free air. We will say, I imagine it is about five inches on sixty thousand, and two inches on thirty-five thousand. Q. About five inches on sixty thousand? A. I imagine so."

The witness then referred to Croft Electrical Handbooks, after which he was again asked:

"Q. You say the jumping or arcing distance at sixty thousand volts is approximately five inches? A. Well, I just assumed that it is somewhere in the neighborhood of that."

An objection was made that Mr. Steenberger had not been properly qualified to express an opinion on the above point, and that his answer was only an assumption. This objection was sustained, and no exception taken.

In view of the record, we are of the opinion there is no competent evidence of what the arcing distance of sixty thousand volts of electricity would be.

We are also of the opinion that the fourth element is not present in this case. We are convinced that respondent had no reason to anticipate or expect that the public

generally, or that children in their search for pigeons or for any other purpose, would climb to the third story of this building, go through an opening which was not a regular opening such as a door or window, out onto a steep roof having a one-quarter pitch, and over this roof to the opening in the disconnect room. It seems to us that to hold in this case that respondent should reasonably have anticipated that boys would reach the place where this unfortunate accident happened would be extending the rule far beyond any case that has come to our knowledge. While we have taken into consideration that, notwithstanding all of the warnings which Gerald Deffland had received, there is the testimony of John Hannus that the watchman on the particular occasion when the accident occurred did not, at least, make any objection to the boys looking for pigeons, there is no testimony that the deceased or any other boy had ever gone out on this roof, or that respondent, even conceding that it knew that boys did go into the plant at times to look for pigeons, had any reason to expect or believe that any boy would go where John and Gerald did on August 31st.

▇▇▇ We are of the opinion that, under the facts in this case and the authorities cited, the attractive nuisance doctrine was not applicable, and it not appearing that respondent had wilfully or wantonly injured the deceased, no recovery can be had by appellant.

We will not refer to the cases from other jurisdictions cited by appellant, but will refer to some of the decisions of this court which appellant cites, namely, *Talkington v. Washington Water Power Co.*, 96 Wash. 386, 165 Pac. 87, and *Clark v. Longview Public Service Co.*, 143 Wash. 319, 255 Pac. 380. In the *Talkington* case, the defendant's power line passed over the roof of a grain warehouse, which had a lean-to, the lower edge of the roof being only eight feet above the ground. A spur of the Great Northern Railway ran parallel to and along the east side of the building, so when a box car was standing on the track opposite the end of the lean-to, its top was nearly level with the lower part of the roof and only thirty-two inches therefrom. Because

of this, it was easy to step from the roof of the car onto the roof of the lean-to. Boys of the town had been, in some degree, in the habit of playing on the roof of the lean-to, and also on the roof of the main building on that side, for some time previous to the time Willard Talkington was injured. The boys would gain access to the roof by climbing onto the freight cars standing at the end of the lean-to and stepping therefrom onto the roof. They would also gain access to the roof by leaning a plank from the ground onto the eaves of the lean-to, where the eaves were only eight feet from the ground.

We think the above recitation of the facts as stated in the opinion is sufficient to distinguish the cited case from the instant case.

We are also of the opinion the *Clark* case, *supra*, is easily distinguished. In that case, the Longview Public Service Company constructed and maintained an electrical transformer and other appliances for reducing and stepping up the high voltage used by it for power in the operation of the pumps of a diking and drainage district. The transformer consisted of a great number of wires highly charged with electricity. The pump house and transformer abutted upon a highly traveled public road, and the high tension wires were brought down vertically from the transmission line near the pump house and were weatherproofed and had the appearance of ordinary insulated wires. We quote from the opinion:

"There was sufficient evidence to show that the appellant must have known that young and old people were in the habit of congregating in great numbers near this pumphouse, and the jury were justified in believing that the appellant should have reasonably anticipated that young people especially might enter this enclosure through these holes, and that the appellant was guilty of negligence in failing to make the enclosure more secure, or in not placing a sufficient number of warnings to apprise the public of the danger lurking in the situation."

In *Tibbits v. Spokane,* 64 Wash. 570, 117 Pac. 397, the contention was made that the court should have instructed the jury that the boys there involved, who were between nine

and thirteen years of age, were incapable of contributory negligence as a matter of law, because they were under the age of fourteen years. The opinion then quotes from *Boyer v. Northern Pac. Coal Co.*, 27 Wash. 707, 68 Pac. 348, to the effect that, while the question whether or not a minor appreciated the danger to which he was subjected is usually a question of fact for the jury, there can be no fixed period when the minor may, as a matter of law, be held to appreciate danger which may surround him. His appreciation of danger would depend more upon his intelligence and experience than upon his age, so that the question of age, when compared with natural intelligence and past experience, may have very little influence in determining the ability of a minor to appreciate danger.

In conclusion, on the question of contributory negligence, we desire to refer to the case of *Hanson v. Washington Water Power Co.*, 165 Wash. 497, 5 P. (2d) 1025. In that case, the boy who was injured by coming in contact with an electric switch which was located sixteen feet above the ground and within a fenced area of Washington Water Power Company, was eleven years of age. The trial court granted a motion of the defendant for judgment notwithstanding the verdict rendered in favor of the plaintiff. We quote from the opinion:

"Counsel for appellant contends that, in entering judgment for the respondent notwithstanding the verdict in favor of the appellant, the trial court invaded the province of the jury, as 'twelve reasonable minds' (the members of the jury) found there was negligence; that the trial court

"' . . . by granting judgment *non obstante* has assumed the prerogative of saying that the facts were such that reasonable minds could not differ with the construction placed by him upon the facts.'

"True, the functions of the jury are not the same as the functions of the court. The jury is a fact-finding body. It must not be forgotten, however, that the court is vested with the authority, and upon it is imposed the duty, of granting a motion for a directed verdict or a motion for judgment n. o. v. when the evidence and all the inferences which the jury could justifiably glean therefrom would be insufficient to support a different finding. . . .

"There was no evidence to go to the jury showing that the respondent was guilty of any negligent act. The respondent was free from negligence as a matter of law in erecting and maintaining its transformer station. The proximate cause of the injuries of Ralph Hanson, Junior, a mentally alert boy of eleven years, was that boy's own negligence. That negligence was of such a character as to show a want of ordinary or reasonable care for his own safety—that degree of care and caution which an ordinarily prudent person, of that boy's age and understanding, would exercise under like or similar circumstances."

In the instant case, aside from the question of "attractive nuisance," and having in mind the dangerous character of the wires entering the disconnect room and all the surrounding circumstances, we are of the opinion there was no evidence to go to the jury showing that respondent was guilty of any negligent act. We are further of the opinion that the proximate cause of Gerald Deffland's injuries was his own negligence.

No exception was taken by appellant to the court's refusal to permit John Hannus to answer the particular question which is the basis for appellant's first assignment of error. Further, we think there is no merit in the assignment.

For the reasons herein stated, the judgment of the trial court is affirmed.

MILLARD, C. J., ROBINSON, and MALLERY, JJ., concur.

February 21, 1947. Petition for rehearing denied.